UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JOHN H. MOBLEY, III, | ) |
| *Plaintiff,* | ) |
| v. | ) Civil Action No.: 3:10CV099 |
| ELEPHANT INSURANCE COMPANY, | ) |
| *Defendant.* | ) |

## COMPLAINT

The Plaintiff, John H. Mobley, III, by counsel, makes the following Complaint against the Defendant, Elephant Insurance Company:

### NATURE OF THE ACTION

1. The Plaintiff, John H. Mobley, III ("Mobley" or "Plaintiff"), brings this action for legal and equitable relief to redress the injuries done to him by the Defendant, Elephant Insurance Company ("Elephant"), for Elephant's unlawful retaliation after Mobley had complained of incidents of race discrimination and racial intimidation at work.

### JURISDICTION, VENUE AND ADMINISTRATIVE PROCEEDINGS

2. This action is brought pursuant to 42 U.S.C. § 1981. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343. Venue is conferred upon this Court pursuant to 28 U.S.C. § 1391(b).

3. All claims presented herein arose and Elephant operates offices within this judicial district and division, and employment records relevant to Elephant's unlawful practice are maintained and administered in this judicial district and division.

## PARTIES

4. Mobley is an African-American man. He is a citizen of the United States and a resident of Richmond, Virginia. Mobley was terminated from employment with Elephant in retaliation for complaining about incidents at work of race discrimination and racial intimidation.

5. Elephant is engaged in the business of selling car insurance in the Commonwealth of Virginia, operates an office in Glen Allen, Virginia, and employs approximately 45 individuals. Except for approximately five African-American employees, all of Elephant's employees are white.

## FACTUAL ALLEGATIONS

6. Plaintiff worked for Elephant from September 1, 2009 until his unlawful termination on or about October 31, 2009.

7. On or about October 14, 2009, Christa (Inu), called Plaintiff by his last name. Nathan Fox, a Caucasian employee, overheard this and asked, "Mowgli, like in *The Jungle Book*?" Plaintiff explained, "No, it's Mobley," to which Fox replied, "It's close; I will just call you Jungle Book Boy."

8. Later in the afternoon, Plaintiff approached Fox and told him that he found the term "Jungle Book Boy" racially offensive. Fox apologized, and Plaintiff accepted the apology and considered the matter resolved and over.

9. On or about October 21, 2009, Plaintiff was talking to a co-worker, Kevin Jackson (African-American) about Jackson's need for a ride to his second job since Jackson was having car trouble. Plaintiff's Supervisor, Briana Boyer, overheard their conversation and said to Plaintiff, "I don't know why you would take the n----r that far. You n-----rs are crazy, that is two hours away. You are a crazy n----r." Plaintiff was extremely upset by Boyer's use of the racist epithet to describe Plaintiff and his African-American coworker. After giving the matter considered thought, Plaintiff sought to file a complaint with Elephant's Human Resources department.

10. On or about October 23, 2009, Plaintiff sent an email to Jane Blanchard at Elephant's Human Resources department, and asked about how to make a complaint against a supervisor. Blanchard returned an email to Plaintiff and asked him to see her. Plaintiff met with two Human Resources managers, Blanchard and Amy Broxterman and told them about Boyer's hostile and offensive comments against black people. Broxterman assured Plaintiff that the company would not tolerate hostile racist behavior and that the company would conduct a confidential investigation. Plaintiff understood this to mean that his identity would not be revealed as a complaining party.

11. Broxterman also asked if anyone else had heard the comments, and Plaintiff gave her Kevin Jackson's name.

12. On Monday, October 26, 2009, Plaintiff and his colleagues learned from the company that Briana Boyer had left employment with Elephant. Brian Finkle ("Finkle") was named as Plaintiff's new Supervisor following Boyer's departure.

13. Following Briana Boyer's departure from the company, Plaintiff became aware that his identity had been revealed as the complaining party.

14. On or about October 28, 2009, Plaintiff was called to a meeting with Broxterman to follow up on his complaints. Broxterman asked Plaintiff if he had any other concerns. Plaintiff told Broxterman that he was concerned that other employees in the office believed that Boyer had been terminated because of Plaintiff's complaint and that people were now hostile toward him. Plaintiff expressed concern that his identity was to have been kept confidential, but that Elephant had identified him as the source of the complaint.

15. On October 31, 2009, Plaintiff's new Supervisor, Finkle, approached Plaintiff and asked if he had scheduled a date when he would take his insurance exam again. Plaintiff informed him that he had not and that in the past the company had been responsible for scheduling the exam.

16. Plaintiff had on three prior occasions taken and failed the exam. Each time, his prior supervisor had scheduled the exam for him.

17. Failing the insurance exam was not uncommon for Elephant employees. Rebekah Midkiff, a white employee of Elephant, failed the exam three times and was retained as an employee while she prepared to take the exam for the fourth time, instead of being suspended without pay. Furthermore, Elephant put Ms. Midkiff in charge of training other employees in preparation for the required exam.

18. The company tells its new hires that they each are expected to take the exam, but that the company will pay for several attempts. Plaintiff was told that he would be suspended without pay for 40 days if he failed the exam four times in a row.

19. On October 31, 2009, Finkle stated to Plaintiff that he would check on scheduling the test but that Plaintiff would need to go out on unpaid administrative leave

4

on Monday, November 2, 2009. Plaintiff inquired why he had to take unpaid leave prior to taking the exam for the fourth time. Finkle did not respond.

20. Finkle then asked Plaintiff for his email address. Plaintiff's response was overheard by Nathan Fox. Upon hearing Plaintiff's email address, Fox said, "So you are a Third?" When Plaintiff affirmed, Fox replied, "So there are three Jungle Book boys?" Finkle was within two or three feet of Plaintiff and clearly heard Fox's racist remark. Plaintiff looked at Finkle to see if he was going to react or respond, but Finkle merely continued typing Plaintiff's information into his computer. Finkle then looked up at Plaintiff and told him that he would have to start his unpaid leave on Monday, November 2, 2009.

21. On November 2, 2009, Plaintiff sent an email to Defendant's HR Department, asking whether the test had been scheduled and reporting Nathan Fox's "three Jungle Book boys" comment.

22. The next day, November 3, 2009, Broxterman called Plaintiff in for a meeting with Broxterman and Finkle. During that meeting, Broxterman stated to Plaintiff, "Word around the office is that you are seeking legal counsel. Do you have a problem with signing something that says you aren't filing a complaint?"

23. Plaintiff told Broxterman that he would not sign any legal document without getting a chance to review it first. At that point, Broxterman asked Plaintiff for the name and fax number of his attorney, so she could fax the document. Plaintiff told Broxterman that he did not have an attorney at this time.

24. Broxterman then asked Plaintiff about the latest incident involving Nathan Fox. After Plaintiff described the incident and the "three Jungle Book boys" statement,

5

Broxterman asked him what he would like for the company to do. Plaintiff then requested that he be moved to another department, away from Fox. Broxterman then told Plaintiff that there were no available positions in other departments and asked if, in light of this situation, Elephant should interpret Plaintiff's request as his resignation. Plaintiff protested that he was certainly not going to resign.

25. Plaintiff next asked Broxterman why he was on unpaid leave. Broxterman responded, "You are on leave because you didn't schedule or take the exam." When Plaintiff explained that Elephant had always been responsible for scheduling these exams, Broxterman and Finkle told Plaintiff that he could take the exam on November 6 at 8:00 a.m. Plaintiff explained that all of the study materials for the exam were at the office and that he needed access to these materials to prepare for the exam. Broxterman and Finkle agreed that Plaintiff would be given access to the study materials at the office.

26. The conversation then turned back to Nathan Fox's statements, and Plaintiff expressed some concerns about confidentiality. At the end of the conversation Broxterman again asked Plaintiff to sign the document promising that Plaintiff would not file any complaint. When Plaintiff refused, Broxterman told Plaintiff that if he did not sign the waiver he would not be allowed to come to the office, and that the company would file trespassing charges if he did any attempts to come to the office. When Plaintiff asked how he would be able to study for the exam without access to the test materials, Broxterman told him that was his problem.

27. At 3:28 p.m. on November 5, 2009, Broxterman sent Plaintiff an email stating that Plaintiff had failed to file a formal written complaint against Fox by

6

November 4, 2009. Broxterman further stated that, if Plaintiff did not file a written statement by 5:00 p.m. on November 5, 2009, she would "assume that [Plaintiff was] not filing a formal complaint and it will be noted in [Plaintff's] file as such."

28. Plaintiff was not permitted to enter Elephant's premises to prepare for the exam, and he did not take the exam on November 6, 2009. As of November 6, 2009, Elephant knew that Plaintiff had not taken the exam.

29. On Monday, November 9, 2009, at 11:20 a.m., Finkle sent several emails to Plaintiff and demanded to discuss with Plaintiff "the following 2 things[...]: 1. The results of your exam. 2. Scheduling a time for you to meet with our HR team to document your formal complaint relating to Nathan." In that message, Finkle wrote that a failure to respond to the email by 4:00 p.m. that day would be interpreted as "job abandonment" and Plaintiff would be terminated immediately.

30. Also on November 9, 2009, Broxterman called Plaintiff on his cell phone and requested him to submit a statement regarding the Fox incident. However, Broxterman also told Plaintiff that he would not be allowed to come to the office to give his statement. Instead, she demanded that he give his statement to her over the telephone. Plaintiff told Broxterman that he was currently in an elevator and that he would have to call her back.

31. Shortly before 5:00 p.m. on November 9, 2009, Broxterman took Plaintiff's statement over the telephone.

32. At 11:40 a.m. on November 11, 2009, Broxterman sent Plaintiff an email seeking confirmation that he had taken the November 6 exam. Broxterman wrote: "I need this information no later than 4pm today, or I will assume that you did not take the exam

7

as required by the agreement you signed on November 3rd, 2009." Broxterman's statement regarding an "agreement" or its "requirements" is hyperbole: Plaintiff did not contract with Elephant to take the exam on November 6, 2009. Further, Broxterman knew that Plaintiff had not taken the November 6 exam.

33.     Elephant terminated Plaintiff on November 11, 2009. In its termination letter Elephant did not mention Plaintiff's complaint about race discrimination and retaliation. Elephant did not apprise Plaintiff of the status or the outcome of any investigation it may have undertaken into the incidents of race discrimination and unlawful retaliation.

## COUNT I
### 42 U.S.C. § 1981-Unlawful Retaliation

34.     Mobley incorporates by reference and realleges the preceding paragraphs as though fully set out herein.

35.     Mobley was engaging in activities protected by 42 U.S.C. § 1981, when he made the complaint and demand of a meaningful investigation into the racially hostile and demeaning statements made by his white coworker, Nathan Fox.

36.     Mobley was engaging in activities protected by 42 U.S.C. § 1981, when he made the complaint and demand of a meaningful investigation into the racially hostile and demeaning statements made by his supervisor, Briana Boyer.

37.     Defendant Elephant unlawfully retaliated against Mobley because of his complaints and demands for a meaningful investigation into the racially hostile and demeaning statements made by his former supervisor Briana Boyer and his white coworker, Nathan Fox.

38. As part of its retaliation against Mobley, Elephant suspended Mobley without pay and instructed him not to return to work, on pain of criminal charges of trespass, as described in the foregoing paragraphs.

39. Elephant retaliated against Mobley

40. Elephant further retaliated against Mobley by terminating him.

41. As a consequence of Defendant Elephant's unlawful retaliation, Mobley has suffered emotional distress, anxiety, stress, embarrassment, humiliation, pain, suffering, and loss of enjoyment of life.

42. As a consequence of Defendant Elephant's unlawful actions, Mobley has lost wages and other financial incidents and benefits of employment.

43. As a consequence of the acts and omissions of Defendant Elephant, Mobley has incurred and will continue to incur attorneys' fees, costs and expenses.

### COUNT II
### 42 U.S.C. § 1981-Unlawful Termination

44. Mobley incorporates by reference and realleges the preceding paragraphs as though fully set out herein.

45. On or about November 2, 2009, Elephant suspended Mobley without pay, purportedly for failing to receive his license as an insurance agent in Virginia. By October 31, 2009, Mobley had unsuccessfully attempted to pass the required agent's test on three occasions.

46. Elephant falsely asserted that it had a policy whereby it suspends without pay for forty days any employee who fails the required state exam three times.

47. Elephant's assertion was false; it did not have such a policy in place.

48. For example, Rebekah Midkiff, a white employee with Elephant, failed the exam three times and was retained as a sales employee instead of being suspended without pay. Furthermore, Elephant put Ms. Midkiff in charge of training other employees in preparation for the required exam.

49. For its white employees who sought to retake the agent's licensing test, Elephant provided study guides and facilities; however, Elephant prohibited Mobley from entering its premises to review study guides for the test, and instead told him that it would file criminal charges of trespass if he came back to work.

50. Elephant treated Mobley differently from Ms. Midkiff, when it suspended him without pay and refused to let him enter its premises to study for the test.

51. Elephant's suspension of Mobley without pay, its threats of criminal prosecution, its sudden and hyperbolic demands for notification and confirmation, and its resort to other various devices, were designed to induce Mobley to abandon his job, or to make it impossible for Mobley to perform his job.

52. Elephant treated Mobley differently from other employees because of his race, African-American, and because he had opposed racial and racist statements made by his former supervisor Briana Boyer and his white coworker, Nathan Fox.

WHEREFORE, the Plaintiff, John H. Mobley, III, demands judgment against Defendant Elephant Insurance Company as follows:

(a) Declaring that the acts and practices complained of herein are in violation of Mobley's rights as secured by 42 U.S.C. § 1981;

(b)     Requiring Defendant Elephant Insurance Company to reinstate Mobley's employment or a position of equal duties and responsibilities, with equal pay and benefits, or in the alternative for an award of front pay;

(c)     Issuing a permanent injunction enjoining Defendant Elephant Insurance Company from continuing or maintaining a policy, practice or custom of denying, abridging, withholding or conditioning the rights of employees on the basis of race, which rights are secured by 42 U.S.C. § 1981;

(d)     Awarding Mobley back pay, prejudgment interest and appropriate recovery for lost employment benefits, and other affirmative relief as may be appropriate, and for all other wages and benefits lost or denied;

(e)     Awarding Mobley compensatory damages under 42 U.S.C. § 1981 in an amount to be determined by the jury at trial;

(f)     Awarding Mobley his attorneys' fees and costs incurred in this action, together with expert witness fees and expenses; and

(g)     Ordering any other relief this court deems to be just and proper.

## DEMAND FOR JURY TRIAL

The plaintiff demands a trial by jury in this action.

JOHN H. MOBLEY, III

By Counsel

_____
Tim Schulte (VSB # 41881)
Blackwell N. Shelley, Jr. (VSB #28142)
Shelley & Schulte, P.C.
700 East Franklin Street, 12th Floor
Richmond VA 23219

(804) 644-9700
(804) 644-9700 [fax]
Tim.schulte@shelleyschulte.com
Blackwell.shelley@shelleyschulte.com